UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
    UNITED STATES OF AMERICA    :

        - v. -       :

        :    16 Cr. 395 (VEC)

    JULIO ALVAREZ,    :

        Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

# GOVERNMENT'S SENTENCING SUBMISSION

 

JOON H. KIM
Acting United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007
*Attorney for the United States*

Sagar K. Ravi
Dina McLeod
Niketh V. Velamoor
Assistant United States Attorneys
   *-Of Counsel-*



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 24, 2017

**BY ECF**

Honorable Valerie E. Caproni
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

    Re: <u>United States</u> v. <u>Julio Alvarez</u>, 16 Cr. 395 (VEC)

Dear Judge Caproni:

    The Government respectfully makes this submission in advance of the sentencing of the defendant Julio Alvarez, which is scheduled for October 31, 2017, at 10:00 a.m. For the reasons set forth below, the Government requests that the Presentence Investigation Report (ECF No. 149, the "PSR") be amended to reflect a total offense level of 25 and a criminal history category of I, resulting in a United States Sentencing Guidelines (the "Guidelines") range of 57 to 71 months' imprisonment. Based on a consideration of the Guidelines and the other factors set forth in Title 18, United States Code, Section 3553(a), the Government respectfully submits that a sentence within that Guidelines range would be sufficient but not greater than necessary to serve the purposes of sentencing and would be fair and appropriate in this case.

### I.    BACKGROUND

    On March 9, 2016, Alvarez and his coconspirators Christopher Campos, Marco Blasio, and Gueris Ramos were arrested and charged by complaint with conspiracy to commit wire fraud and bank fraud from in or about October 2012 up to and including in or about September 2013, in violation of 18 U.S.C. § 1349; bank fraud, in violation of 18 U.S.C. §§ 1344 and 2; and wire fraud in violation of 18 U.S.C. §§ 1343 and 2 (ECF No. 1). On June 7, 2016, a grand jury returned an indictment (the "Indictment") against Alvarez, Campos, and Ramos with the same charges (ECF No. 31). On June 9, 2017, the Friday before trial was scheduled to begin, Alvarez pled guilty to all three counts of the Indictment. On June 22, 2017, Campos was convicted of all three counts of the Indictment after a jury trial, during which significant evidence regarding Alvarez was introduced.

## II. THE APPLICABLE GUIDELINES RANGE

In the PSR, the Probation Department concluded that the defendant's total offense level is 31, criminal history category is I, and that the applicable Guidelines range is 108 to 135 months' imprisonment. (PSR ¶¶ 82, 85, 115.) In light of information the Government has obtained from victim-lenders regarding the actual loss amount, the Government respectfully submits that the Guidelines calculation set forth in the PSR be amended as set forth below.

### A. Offense Level[1]

1. The applicable Guidelines manual is dated November 1, 2016.

2. Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is 7.

3. Pursuant to U.S.S.G. § 2B1.1(b)(1)(H), because the actual loss is more than $550,000 but not more than $1,500,000, there is an increase of 14 levels. In calculating the loss amount, the Government received information from victim-lenders for 119 of the approximately 200 cars fraudulently purchased as part of the scheme. The actual loss amount for the 119 cars totals $1,236,365, which includes credits against the loss for amounts paid on the loans before the offense was detected and amounts the victim-lenders recovered by disposition of the collateral (*i.e.*, selling the cars repossessed at auction), or if the collateral has not been disposed, the fair market value of the collateral. *See* U.S.S.G. § 2B1.1 cmt. n.3(E). Where the actual loss amount could not be calculated for a car because sufficient information was not provided by the victim lender, the Government has not included any losses for those cars in the loss calculation.

4. Pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), because the offense involved 10 or more victim-lenders, there is an increase of two levels.

5. Pursuant to U.S.S.G. § 3B1.1(a), because the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive, there is an increase of four levels.

6. Assuming the defendant clearly demonstrates acceptance of responsibility to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a).

In accordance with the foregoing calculations, the applicable Guidelines offense level is 25.[2]

---

[1] The three counts of conviction should be grouped together pursuant to U.S.S.G. §§ 3D1.1 and 3D1.2.

[2] The Government is not including the two-level enhancement under U.S.S.G. § 2B1.1(b)(16)(A) because the gross receipts to the defendant individually, rather than to all participants, did not exceed $1,000,000. *See* U.S.S.G. § 2B1.1 cmt. n.12(A).

### B. Criminal History Category

Because the defendant has no criminal history points, the defendant's Criminal History Category is I.

### C. Sentencing Range

Based upon the calculations set forth above, the defendant's Guidelines range, based on an offense level of 25 and a criminal history category of I, is 57 to 71 months' imprisonment.

## III. APPLICABLE LAW

The Guidelines still provide strong guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005), although they are no longer mandatory. "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" – that range "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007). As the Second Circuit has noted, although the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice." *United States* v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted).

After making the initial Guidelines calculation, a sentencing judge must then consider the seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent the Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure

that the justification is sufficiently compelling to support the degree of the variance.'" *Cavera*, 550 F.3d at 189 (quoting *Gall,* 552 U.S. at 50).

## IV.   DISCUSSION

The defendant's criminal conduct weighs in favor of a sentence within the applicable Guidelines range of 57 to 71 months' imprisonment.

### A.   The Seriousness of the Defendant's Conduct and Just Punishment

First, a sentence within the Guidelines range is necessary to reflect the seriousness of the defendant's conduct and to provide just punishment for the offense. As the Court is aware from presiding over the trial of Campos, Alvarez was at the center of a conspiracy to fraudulently purchase hundreds of new personal use cars through loans issued to straw buyers by various banks, when in fact other individuals were going to use the cars as livery cabs and pay off the loans. (PSR ¶ 23.) The applications to obtain these loans contained several material misrepresentations, including but not limited to false representations that (1) the straw buyers would be using the cars for their personal use; (2) the straw buyers would be paying off the loans; and (3) that each straw buyer would be purchasing one car, when in fact straw buyers purchased as many as ten or twenty new cars at once. (*See, e.g*., *id.* ¶¶ 40, 43, 46, 50.) Had the lenders known that the straw buyers would not be using the vehicles for personal use, that someone else was actually paying off the loans, and that straw buyers were buying multiple vehicles at a time, the lenders would not have financed these car purchases relying on the credit of straw buyers who could barely afford to buy a single car. (*See id.* ¶ 23.) In total, the scheme involved at least 20 straw buyers who purchased more than 200 new cars using more than $7 million in fraudulent bank loans. (*Id.* ¶ 24.)

The scheme started and ended with Alvarez, who was the only member of the conspiracy who participated throughout the entirety of the scheme. Alvarez began the scheme with Norberto Tavares in order to make money by building a livery cab business with as many cars as possible, and codefendants Ramos and Campos joined thereafter. (*Id.* ¶¶ 34-37, 51.) When Taveras proposed to Alvarez that they obtain cars legally through a fleet deal, Alvarez specifically rejected that approach because he knew they only had the capital to purchase a few cars and Alvarez wanted hundreds of cars to be more profitable. (*Id.* ¶ 35.) Alvarez, who had experience in the livery cab business and owned and operated multiple businesses in New York City, managed the day-to-day operations of the scheme by collecting payments from cab drivers who leased the cars purchased through the scheme and making loan payments to lenders on behalf of the straw buyers. (*Id.* ¶ 39.) Alvarez also insured the cars through his brokerage business (*id.*) and reregistered the cars from personal use – which was falsely represented on registration forms submitted to the DMV – to livery cabs under companies controlled by him (*id.* ¶ 45). When a problem arose from certain cars being registered in New Jersey instead of New York because they were purchased by straw buyers who lived in New Jersey, Alvarez instructed at least two straw buyers to falsely provide an address in New York so that the cars could be registered in New York and utilized as livery cabs. (*Id.* ¶ 61; Campos Trial Transcript ("Tr.") at 188-89, 524-30.)

After the initial straw purchases by Ramos, the scheme began to expand to include additional straw buyers with good credit histories, including straw buyers recruited by both

Alvarez and Campos who told them they would not have to pay any money. (*See, e.g.*, PSR ¶¶ 43, 51-52, 59-60.) Alvarez met with potential straw buyers at his office in order to recruit them to participate in the scheme, connected those straw buyers with car dealerships who were in on the scheme, and accompanied straw buyers when they visited the dealerships in order to facilitate the submission of fraudulent loan applications to lenders. (*See, e.g., id.* ¶ 54; Tr. 482, 578.) And even when Alvarez was specifically told by Taveras that one dealership would no longer be involved in the scheme because what they were doing was illegal, Alvarez continued the scheme by switching to a different car dealership that was willing to arrange the fraudulent car purchases. (PSR ¶ 49; Tr. 183-88.)

Starting in the latter half of 2013, because Alvarez was struggling to get the fraudulently purchased cars on the road as livery cabs, he began falling behind on making payments to the lenders. (PSR ¶ 62.) As a result, banks began to call the straw buyers about the missed loan payments. However, because those straw buyers did not know anything about where the cars were located or when payments were going to be made, the scheme began to unravel as lenders realized they were being defrauded. Ultimately, most of the loans obtained through the scheme went into default and many of the cars were repossessed. (*See id.* ¶ 24; Tr. at 530-31.)

The defendant's leadership role in this multi-million dollar scheme involving over 200 fraudulently purchased cars and over 20 participants is very serious. The widespread fraud perpetrated by the defendant involved fraudulent loan applications submitted to over 20 lenders and, based on the information currently provided to the Government, actual losses to those lenders exceeded over one million dollars. In addition to the harm suffered by lenders, several of the straw buyers who were recruited to participate in the scheme by Alvarez were financially ruined as a result of the default of the loans. For these reasons, the seriousness of the defendant's conduct and the need for just punishment warrant a sentence within the applicable Guidelines range.

### B. The Need for Adequate Specific Deterrence and to Protect the Public

Second, a sentence within the Guidelines range is necessary to afford adequate deterrence to this defendant and to protect the public from further crimes of the defendant. While Alvarez has no criminal history and ultimately took responsibility for his conduct by pleading guilty, he continued committing the instant offense after he was specifically informed in March 2013 that an attorney from one of the car dealerships essentially told Taveras that what they were doing was fraudulent. (PSR ¶ 49; Tr. 186-87.) Indeed, a significant portion of Alvarez's criminal conduct occurred after this clear warning failed to deter him. Accordingly, a significant sentence within the applicable Guidelines range is necessary to discourage the defendant from committing further crimes following his release from prison and would impress upon him the serious consequences of his criminal conduct.

### C. The Need for General Deterrence and Respect for the Law

Third, a sentence within the Guidelines range is necessary for general deterrence and to promote respect for the law. The sentence in this case should indicate to the public that making fraudulent representations to financial institutions in order to obtain money – even if no loss was ultimately intended – is a serious crime with harmful effects on a financial system we all rely upon.

Particularly when it comes to consumer loans such as the car loans fraudulently obtained here, banks must be able rely on representations made in loan applications and defendants like Alvarez took advantage of that system for his personal gain.  Alvarez also did not just lie to a couple banks; he ran an illegal business that relied on systematic lies to over 20 banks in order to obtain capital and resulted in over a million dollars in losses.  Sending a strong message that such a large-scale fraud will carry serious penalties is necessary and appropriate under the circumstances and will promote general deterrence and respect for the law.

## V. CONCLUSION

For the foregoing reasons, the Government respectfully submits that the defendant should be sentenced within the applicable Guidelines range of 57 to 71 months' imprisonment.

Respectfully submitted,

JOON H. KIM
Acting United States Attorney

By: _____
Sagar K. Ravi
Dina McLeod
Niketh V. Velamoor
Assistant United States Attorneys
(212) 637-2195 / 1040 / 1076